MILLS v. HURD and others. (Four Cases.)

*(Circuit Court, D. Connecticut. January 6, 1887.)*

INJUNCTION—PENDENTE LITE—RECEIVER—CORPORATIONS.

Where a plan for the incorporation and consolidation of certain joint-stock associations was being carried out, by consent of nearly all the stockholders, under a charter from the legislature, and one of the stockholders, who had previously favored the scheme, sought by suit in equity to prevent it, and to compel an accounting, and the winding up of the old companies, *held*, that, as the charges of fraud made in the bill appeared to be baseless, and no harm was likely to ensue to any one from allowing the proceedings to go on, questions of law arising concerning the validity of the proceedings in several respects would not be decided upon a motion for an injunction and receiver *pendente lite*, and that such motion would be denied.

In Equity.

*Alvan P. Hyde* and *Wm. A. Underwood*, for plaintiff.

*Henry C. Robinson* and *Goodwin Stoddard*, for Consolidated Rolling-stock Co.

*Wm. C. Case* and *T. M. Maltbie*, for Hurd.

SHIPMAN, J. These four motions are for an injunction *pendente lite*, and for the appointment of a temporary receiver in each of said four cases. Upon these motions, supported and opposed by *ex parte* affidavits, it is not expedient to attempt to make an exhaustive finding of facts. I shall give merely an outlined statement.

Frederick H. Mills, the plaintiff, and John Hurd, one of the defendants, organized on October 1, 1881, an association by the name of the Housatonic Rolling-stock Company, which subsequently issued 27,400 shares of stock, of $100 each, and owned 1,644 railroad freight cars. On December 1, 1878, they organized the New England Rolling-stock

Company, which had a nominal capital of $1,011,700, divided among 311 stockholders, and owned 607 freight cars. On August 15, 1879, they organized the Boston & Maine Rolling-stock Company, having a nominal capital of $1,250,000, and 365 shareholders, and owning 750 freight cars. On August 2, 1880, they organized the Bridgeport Rolling-stock Company, having a nominal capital of $3,333,300, divided among 1,170 shareholders, and owning 2,000 freight cars.

The office of each of these associations was to be in the city of Bridgeport, Connecticut, unless the trustees should locate it in some other place. The offices remained in Bridgeport until September, 1884, when they were moved to Detroit, Michigan. They were moved back to Bridgeport, on October 11, 1886, by a vote of four trustees, at a meeting at which said Mills was not present.

These associations are what are generally known as "car trust associations," formed for the purpose of owning freight cars, and leasing them to railroad companies. They are not corporations, but are unincorporated associations, the nominal capital of which is represented by certificates of stock, and the owners of these certificates are shareholders in the association. The associations resemble that class of partnerships which are not dissolved by the death or bankruptcy of a member, or by the assignment of his interest. *Kahn* v. *Smelting Co.*, 102 U. S. 641; *Bissell* v. *Foss*, 114 U. S. 252; S. C. 5 Sup. Ct. Rep. 851.

By the articles of association of each company, the title to its property was vested in a board of trustees, upon whom exceedingly large powers were conferred. Mr. Hurd and Mr. Mills were the original trustees. The former was president and treasurer, and the latter was the secretary, of each company. Hugh K. Ritchie, of Montreal, Canada, was subsequently appointed a third trustee.

In the spring of 1884 serious dissatisfaction existed among the stockholders of all the companies in regard to Hurd's management, and a bill for an injunction, an accounting, and the appointment of a receiver, was brought in the superior court for Fairfield county against Hurd and Mills. They represented the calamitous results which would happen from a receivership. David Trubee and H. C. Cogswell, both of Bridgeport, were appointed additional trustees, and the suit was withdrawn.

The dissatisfaction did not subside, and an advisory committee of stockholders was appointed, who reported, on August 19, 1885, that it was best to obtain from the legislature of some state a charter incorporating the stockholders of all the companies as one corporation, which should take all the cars, each stockholder in the new corporation receiving one share for each two shares in the old companies. The other assets of each trust were to be divided among the stockholders therein. A printed copy of this report was sent to each stockholder, with a printed form of assent to the proposed reorganization. This assent was directed to the trustees of the four companies, and was as follows: "The subscriber, a stockholder in one or more of the above companies, hereby consents to the reorganization and consolidation of said companies under the plan suggested in the report of the advisory committee."

About 99½ per cent. of the shareholders in the New England Company, about ·99½ per cent. of the shareholders in the Boston & Maine Company, about 90 7-10 per cent. of the shareholders in the Bridgeport Company, and about 87 8-10 per cent. of the shareholders in the Housatonic Company, signed and forwarded these assents to Mr. Deacon, the book-keeper of said four companies. This plan of consolidation, under a charter, for the purpose of relieving said Hurd from the exclusive control of said business, and placing the control in the hands of the stockholders, was thus received with favor by 92⅞ per cent. of all the stockholders in said companies.

The general assembly of the state of Connecticut granted a charter, approved April 13, 1886, by which all the stockholders in said four companies were constituted one corporation, by the name of the Consolidated Rolling-stock Company. The charter provided, among other things, as follows:

"Sec. 9. Upon the organization of this corporation, it shall be capable of receiving, and the trustees of the rolling-stock associations mentioned in the first section hereof are hereby authorized to transfer to this corporation, its successors and assigns, any or all the property of every kind of the said rolling-stock associations; and upon such transfer this corporation, its successors and assigns, shall become the owner of all said property, and shall thereby and thereupon acquire and be entitled, in law and in equity, to avail itself of every right, title, claim, and interest which before such transfer belonged, either in law or in equity, to either of said rolling-stock associations, or to the trustees thereof. Payment for said property may be made by this corporation issuing, to the holders of the shares of stock in either of said rolling-stock associations, its stock in the proportion of one share of stock of this corporation to two shares of stock in either of said rolling-stock associations."

"Sec. 11. All executors, administrators, conservators, guardians, and trustees may surrender and assign any stock in either of the associations mentioned in the first section hereof, held by them as such, to such new corporation, in exchange for its stock, in the manner above provided; and the trustees of any of said rolling-stock associations are hereby authorized and empowered to sell, assign, and convey to this corporation any assets in their hands, as such, for cash, or the stock of this corporation."

Another section provided that the cash value of the stock of any non-assenting stockholder should be appraised by appraisers appointed by the superior court for Fairfield county, and, on tender of the sum fixed by the appraisal, such stock should be surrendered and assigned to the corporation.

At a meeting of the corporators in Bridgeport, on August 11, 1886, the charter was accepted, by-laws were adopted, and directors were chosen, Mr. Mills being one of the number, who met on August 18, 1886, and elected the officers of said corporation, Mr. Mills being present. At a meeting of the trustees of each of said four companies, on May 19, 1886, the following vote was passed, three of said trustees voting in favor thereof, the said Mills not voting, and said Cogswell not being present:

"Resolved, that John Hurd be, and he is hereby, appointed agent of this company, to transfer to the Consolidated Rolling-stock Company, upon demand

by said company, so much of the money, choses in action, bills receivable, claims, demands, or rights of any and every kind whatsoever, as, with cars already transferred to said Consolidated Company, shall make the assets of this company transferred to said Consolidated Company, share for share, equal to the assets of the Housa. R. S. Co."

On October 8, 1886, at a meeting of the trustees of each of said associations, the following vote was passed by each board, said Mills not being present:

"Whereas, the legislature of the state of Connecticut has incorporated a company by the name of the Consolidated Rolling-stock Company, to obtain and receive from this association its rolling stock, and other property and assets, and to hereafter manage, control, and administer the same; and whereas, said corporation has been duly organized; and whereas, about ninety per cent. of the shareholders of this association has assented to the transfer of the assets of this association to said corporation:

"Now, therefore, resolved that the possession and title of the assets of this association, hereafter mentioned, be, and the same hereby are, in consideration of the premises, transferred and made over to. and conveyed to and vested in, said Consolidated Rolling-stock Company, and its successors and assigns, forever, namely, all freight cars and rolling stock of every kind, and parts thereof, and the material for the repair or manufacture thereof; all buildings and structures; all leases, contracts, and agreements; so much of the other assets of this association as shall make the whole assets transferred to said corporation, as compared with its stock now issued and outstanding, of a value equal to the value of the assets as compared with their stock, of either the [in the vote of the trustees of each of the four associations the names of the other three associations than the one voting are here inserted] rolling-stock companies, which have been or may be transferred to said corporation, to carry out the purposes of its incorporation.

"Resolved, that John Hurd be, and he hereby is, appointed agent of this association, to make, execute, and deliver to said corporation, in due form, the conveyance and transfers herein provided for, and to take proper receipt therefor."

On October 16, 1886, by authority of said votes, the said Hurd executed bills of sale by each of said companies to the new corporation. Each bill of sale contained a schedule of the cars which were transferred, and also conveyed "all contracts and agreements, leases, rights, buildings, and structures, and all interest in and to the same, all parts and portions of cars, and all materials of every kind for the construction or repair of cars." Said Consolidated Rolling-stock Company is now managing said cars, and the business connected therewith. All the assets of neither company were transferred. Each company has still to settle its account with said Hurd. On October 20, 1886, the subpœnas, bills, and restraining orders in these cases were served upon the defendants.

Until after the first meeting of said directors, on August 18, 1886, the said Mills had indicated no hostility to the formation of said new corporation, or dissatisfaction with the scheme of consolidation and reorganization, but, on the contrary, was actively in favor thereof. He owns 315 shares in said companies, and also claims to be a creditor of each company. The plaintiff's counsel state that another stockholder, who owns 101 shares, wishes to become a co-plaintiff with Mills.

The prayer of each of the four bills is for an account by said Hurd of all his financial dealings with said respective companies; that a like accounting be taken of the dealings of the other trustees; that all the defendant trustees may be enjoined against selling or disposing of any of the assets of said companies to the new corporation, or to any other person, and from collecting any dues belonging to said companies; that the Consolidated Rolling-stock Company may be enjoined against purchasing or receiving the cars or other assets of said old companies. The bills further ask for the appointment of a receiver to take possession of all the property of said four companies, for a winding-up of their affairs, a sale of their property, and a distribution of the proceeds among the shareholders.

The bills allege, as the grounds of their prayers, the great mismanagement by said Hurd of the four companies, which improper conduct is described at length; that any transfer of their assets to the new corporation is without consideration, is an actual and intended fraud by said Hurd upon the stockholders of the said companies, in which intention 'the other trustees participate; that very few of the shareholders have any knowledge of or have consented to the proposed transfer; that no stock has as yet been surrendered; and that non-consenting stockholders will be injured by the transfer. In the argument the further points were made that the trustees had no rightful authority to make such a transfer, without previous assent of the stockholders thereto, and before surrender of all of the old stock; that no transfer ever had been made, because said Mills had neither joined in the votes nor in the bills of sale; and that the legislature of Connecticut had no authority to incorporate the members of four partnerships, which were located in another state; and that the charter was without validity as to any non-assenting shareholders. In the affidavit of said Mills it is stated as his belief that the scheme of reorganization was for the purpose of freeing said Hurd from liability to the old stockholders for his mismanagement, and of-continuing his control in the future, under cover of a friendly board of directors. The looseness of the vote under which said Hurd made the transfer is also commented upon.

The Consolidated Rolling-stock Company and the said Ritchie, Trubee, and Cogswell, trustees of the old companies, take no issue with the plaintiff as to the mismanagement of said Hurd, and his improper conduct in the past.

From the affidavits it clearly appears that the plan of reorganization through a consolidated company was devised and pushed through by those stockholders who were dissatisfied with Mr. Hurd, for the purpose of divesting him or any trustees from the supreme control which they could exercise under the articles of association, and of placing the control in the hands of the stockholders generally. The whole plan was adverse to Mr. Hurd; and, while the new directors judiciously retain the benefit of his knowledge of the details of management, they seem to be striving to conduct the business wisely, and for the benefit of all the owners of the property. The idea of fraud in the transfer, or of fraud in the new cor-

poration, is baseless. The general plan of reorganization was assented to by about 90 per cent. of the stockholders of the four companies, and has not been publicly dissented from, except by the plaintiff and one other stockholder.

It is true that the transfer to the new corporation was made before the old stock was called in to be exchanged. Ordinarily, a different order of procedure would have been the natural one, but it is manifest that the managers of the corporation had a great desire to obtain the title to and general control of the property, and to be in a position where they could have an audible voice and an energetic hand in the management; and, instead of waiting for 3,000 shareholders to send in their certificates, trusted to their previously expressed willingness to make the exchange. It seems not improbable that, having two evils to choose from, the directors selected the least.

I find from the affidavits no such equity on the part of the plaintiff as should lead to an arrest of the plan of reorganization, a sale of the assets, and a division of the avails among the stockholders. Thus far, nine-tenths of them apparently prefer an altogether different course, which now promises to be much better for their pecuniary advantage than a sale under the authority of a receiver would be.

The plaintiff insists that the transfer, or any transfer which is not authorized by all the trustees, is void. "When a trust or authority is delegated for mere private purposes, the concurrence of all who are intrusted with the power is necessary for its due execution." *Sinclair* v. *Jackson*, 8 Cow. 543. This is the general and well-settled rule; but I am not prepared to say that the rule is applicable to a board of trustees, under these articles of association, which seem to treat the trustees as acting under the system which belongs to a board of directors of a corporation. I have serious doubts whether the technical rules in regard to trustees are applicable to these boards, and whether they do not act by resolution passed by the votes of those present at a legally called meeting, a quorum being present, rather than by unanimous action.

The next point is that the charter is a void instrument as to any non-assenting stockholders. If it is seen that danger of actual harm to stockholders will ensue, unless the action of the new corporation is arrested by an injunction, it would be proper, in deciding these motions, to pass upon the legal questions which may be made under the charter. But unless the occasion is more urgent than it appears to be in the present case, it would be unwise, upon these motions, without careful discussion of the subject by counsel, to go into the question of the validity of an act of the legislature, and to express an opinion upon a subject of such importance.

The motions for injunction *pendente lite*, and for a receiver, are denied, and the restraining orders are dissolved.